MARK S. CLAWSON AND DARLENE J. CLAWSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Clawson v. Commissioner
Docket Nos. 3578-79 and 16264-80.
United States Tax Court
T.C. Memo 1982-321; 1982 Tax Ct. Memo LEXIS 421; 44 T.C.M. (CCH) 77; T.C.M. (RIA) 82321; June 9, 1982. Gloria T. Svanas, for the petitioners. Cynthia J. Olson, for the respondent. *423 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These consolidated cases were assigned to and heard by Special Trial Judge John J. Pajak pursuant to the provisions of section 7456(c) of the Internal Revenue Code of 1954, [1] and Rule 180. [2] The Court agrees with and adopts the Special Trial Judge's Opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(a) as follows: Year
Deficiencies in Tax
Additions to Tax
1975
$ 2,874.25
$ 143.71
1976
4,069.11
203.46
1977
5,216.37
260.82
1978
6,080.21
304.01
The issues for decision *424 are: (1) whether so-called "family trusts" purportedly created by petitioners are entitled to be treated as entities separate and distinct from the petitioners; (2) whether the attempted conveyance of petitioners' lifetime services to a purported family trust was effective to relieve petitioners from income taxes on part of their earnings; (3) whether petitioners are to be treated as the owners of the purported family trusts under sections 671 through 677; (4) whether petitioners are entitled to deductions on their 1976 and 1977 income tax returns for payments to Individual Retirement Accounts in excess of the amounts allowed by respondent; (5) whether petitioners are entitled to deductions for business expenses under section 162 on their individual income tax returns for 1975 through 1978 in excess of the amounts allowed by respondent and (6) whether petitioners have established that the underpayments of tax for the years 1975 through 1978 were not due to negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this *425 reference. At the time the petitions in these cases were filed, petitioners resided in Derby, Kansas. Petitioners filed joint income tax returns for the calendar years 1975 through 1978. Since 1952 and continuing throughout the years here at issue, petitioner Mark S. Clawson (Mark) worked as an accountant in Derby, Kansas. He operated his business out of his home as a sole proprietorship. Until March 26, 1975, his business was known as M.S. Clawson & Company. His accounting practice included the preparation of Federal income tax returns. In 1975, petitioners purchased documents frm Educational Scientific Publishers (ESP) for the purpose of creating the Mark S. Clawson Equity Trust and the M.S. Clawson & Company (A Trust). Petitioner identified three ESP representatives who told him about the trust packages: Mr. Kippenburger of Wichita, Kansas, an engineer who worked for Boeing Airplane Company; Dean Wolzen of Oklahoma City, Oklahoma, who to Mark's knowledge was a salesman; and Andrew Kaminski of Denver, Colorado, who was in the insurance field. Mark attended one seminar given by Wolzen and Kaminski. About three months later, Mark purchased the ESP trust package for *426 $ 1,750.00. In January 1975, petitioner Darlene J. Clawson (Darlene) executed an affidavit and a series of quitclaim deeds by which she purportedly conveyed to Mark all her right, title and interest in and to her real and personal property and "included therein is the exclusive use of [her] lifetime services and all of the currently earned remuneration therefrom and from any source whatsoever." On January 27, 1975, Mark executed, as grantor, a preprinted ESP form entitled "Declaration of Trust Of This Pure Trust" for the Mark S. Clawson Equity Trust (Equity Trust). The purpose of the Equity Trust was set forth as follows: THE DECLARED PURPOSE OF THE TRUSTEES OF THIS TRUST shall be to accept rights, title and interest in and to real and personal properties, whether tangible or intangible, conveyed by THE CREATOR HEREOF AND GRANTOR HERETO to be the corpus of THIS TRUST. Included therein is the exclusive use of hIS lifetime services and ALL of hIS EARNED REMUNERATION ACCRUING THEREFROM, from any current source whatsoever, so that MARK S. CLAWSON (Grantor-Creator's Name) can maximize hIS lifetime efforts through the utilization of hIS Constitutional Rights; *427 for the protection of hIS family in the pursuit of hIS happiness through hIS desire to promote the general welfare, all of which MARK S. CLAWSON (Grantor-Creator's Name) feels he will achieve because they are sustained by hIS RELIGIOUS BELIEFS. On the same day, Mark executed a bill of sale, an affidavit and a series of quitclaim deeds by which he purported to convey his real and personal property to the Equity Trust. Included in the properties purportedly transferred were petitioners' personal residence, their life insurance policies, household furnishings, rental properties, Mark's accounting business, and the exclusive use of petitioners' lifetime services and all remuneration accruing therefrom. Petitioners retained title in three automobiles which they leased to the Equity Trust. The Equity Trust was to be administered by its trustees, with a majority vote of the trustees requied for expenditures (including compensation of the trustees). The Equity Trust was established for a period of 25 years. However, at their discretion the trustees by unanimous vote could liquidate the Equity Trust at any time "because of threatened depreciation in values, or other *428 good and sufficient reason * * *." Upon liquidation, the assets of the Equity Trust were to be distributed pro rata to its beneficiaries. Included in the documents executed on January 27, 1975, was one appointing Mark as executive trustee of the Equity Trust. The original trustees of the Equity Trust were Aldene A. Kaminski and Darlene. Mrs. Kaminski was connected with ESP. She was a trustee only to set up the Equity Trust and resigned as trustee several days after the creation of the Equity Trust. On September 1, 1975, petitioners' adult daughter, Deborah Anne Hamby (Deborah), was appointed as a trustee. Petitioners continued to hold their positions as trustees throughout the years at issue. The meetings of the trustees were held in petitioners' home. The beneficial interests in the Equity Trust were divided into 100 units in certificate form. These were preprinted ESP forms. Ownership of a beneficial certificate did not give the holder any title or interest in, or right to manage, the Equity Trust property. This was set forth in the certificates of beneficial interest which state that the benefits conveyed consisted solely of the "emoluments as distributed by the action *429 of The Trustees and nothing more." The certificates were transferable and in fact transfers of the units were made. the certificates were issued in the names of members of petitioners' family. After various transfers on January 27, 1975, each petitioner held fifty units of beneficial interest in the Equity Trust. After various transfers on October 30, 1977, Mark held five units of beneficial interest in the Equity Trust, as did each of petitioners' nine children. On March 26, 1975, petitioners as trustees of the Equity Trust executed an ESP form entitled "Declaration of Trust Of This Pure Trust" for the "M.S. Clawson & Company (A Trust)" (hereinafter referred to as the Business Trust). This ESP form appears to be similar, if not identical, to the one used to create the Equity Trust. [3] Petitioners were the original and only trustees of the Business Trust during the years in issue. During those years, the Equity Trust held all 100 units of beneficial interest in the Business Trust. *430 Both the Equity Trust and the Business Trust filed their Federal income tax returns on a fiscal year ending September 30th. Petitioners filed their Federal income tax returns on a calendar year basis. Before creation of the trusts, petitioners jointly owned the property purportedly transferred to the trusts. The mortgages on petitioners' real properties, for which petitioners were personally liable, were not renegotiated between the trusts and the mortgagees after creation of the trusts. During the years in issue, mortgage payments were made by checks drawn by petitioners on the Equity Trust checking account. After creation of the trusts, petitioners opened checking accounts for the trusts. Both petitioners had signature authority over the trusts' checking accounts. During the periods in issue, no other person had signature authority over the trusts' checking accounts. The financial affairs that petitioners allegedly were handling on behalf of the trusts were the same as their financial affairs prior to the creation of the trusts. Despite the alleged transfer of petitioners' property, including their home and personal household goods, petitioners' use of these personal *431 items remained unchanged. The Business Trust did not direct the operation of Mark's accounting business. Mark operated that business out of his home before and after the creation of the trusts. Nor did management of their rental properties change after creation of the Equity Trust. At trial Mark asserted that he used 38 percent of his home as "Accounting Office-Office In Home" and that he traveled 30,251 miles in the course of his business during 1977. The office in his home was Mark's only place of business during the years in question. During the years here at issue and continuing to date, Mark's accounting clients have used trust arrangements similar to the ones at issue. He testified that he has at least eight such clients at the present time and that he prepares tax returns for them. Mark has advised his clients that the trusts are valid for Federal income tax purposes. Mark has received finder's fees from ESP for referring customers to ESP. On their Federal income tax returns for 1976 and 1977, petitioners claimed deductions of $ 223.00 and $ 450.00, respectively, for contributions to an Individual Retirement Account (IRA) for Darlene. Petitioners based their *432 IRA deductions only on the $ 3,029.00 and $ 3,000.00 claimed to have been received by Darlene as "consulting fees" from the Equity Trust in 1976 and 1977, respectively. In 1977, Darlene also received Form W-2 income from Wesley Medical Center in the amount of $ 1,343.08 and from Retail Grocery Inventory Service in the amount of $ 134.20, for a total of $ 1,477.28. Both petitioners disregarded their purported assignments of their lifetime services and disregarded the trusts themselves by reporting on their joint returns substantial amounts of income designated "Contract Income From Nominee Trustee" and "Consultant Fee." In his determination, respondent disregarded both trusts and made numerous adjustments to tax the petitioners as if the trusts had not been created. Respondent attributed to petitioners the net profits of the accounting business reported by the Business Trust in the amounts of $ 13,671.10 in 1975, $ 9,350.10 in 1976, $ 4,198.13 in 1977 and $ 22,038.37 in 1978. Respondent disallowed deductions of amounts shown on the individual returns as payments of nominee income to the Equity Trust in the amounts of $ 2,024.00 in 1975, $ 3,000.00 in 1976, $ 10,131.00 in 1977 *433 and $ 6,939.00 in 1978. Respondent attributed net rental income and loss reported by the Equity Trust to the petitioners in the amount of ($ 616.33) in 1975, $ 993.82 in 1976 and $ 818.75 in 1977, and in 1978 increased the net rental and royalty income reported in the individual return by $ 728.81. Respondent disallowed deductions for contributions to an Individual Retirement Account (IRA) in amounts of $ 223.00 in 1976 and $ 228.30 in 1977. Respondent allowed an IRA deduction of $ 221.70 based on the Form W-2 income earned by Darlene. [4] Respondent determined that Mark was subject to self-employment tax for his accounting business income in all the years in issue. Respondent made other adjustments favorable to petitioners. Respondent also determined that the additions to tax under section 6653(a) applied to all the years in issue. OPINION We are again faced with a so-called family trust case, this time with petitioners who used not one, but two ESP family trust forms *434 in their vain attempt to avoid payment of taxes due. We have previously held that an ESP trust lacked economic substance and was a nullity for Federal income tax purposes. Markosian v. Commissioner,73 T.C. 1235 (1980). [5] The fact that petitioners used two ESP trusts instead of one merely complicates the tax picture presented to the Internal Revenue Service. The bifurcation of petitioners' family trust does not result in an obfuscation of the result. Two times nothing is still nothing. The petitioners' adherence to and claimed reliance on form does not avoid the substance of this Court's consistent rulings that ESP trusts do not shelter taxpayers from taxation. [6] Their attempts to paper over their scheme were transparent. For the reasons carefully explained in Markosian v. Commissioner,supra, we find that both the Equity Trust and the Business Trust lacked economic substance and were nullities for Federal income tax purposes. *435 This ESP family trust situation is a classic case of improper anticipatory assignments of income by petitioners. Their attempts to assign their lifetime services to the Equity Trust are ineffective to escape taxation on their income. It is a basic principle of Federal income taxation that income is taxable to the one who earns it. Lucas v. Earl,281 U.S. 111 (1930). The Supreme Court stated in United States v. Basye,410 U.S. 441, 450 (1973) that: "The principal of Lucas v. Earl, tht he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system." This principal has been applied to taxpayers in a constantly increasing list of socalled family trust cases similar to the present one. See, e.g., Vnuk v. Commissioner,T.C. Memo. 1979-164, affd. 621 F.2d 1318 (8th Cir. 1980); Vercio v. Commissioner,73 T.C. 1246 (1980); Wesenberg v. Commissioner,69 T.C. 1005 (1978); *436 Horvat v. Commissioner,T.C. Memo. 1977-104, affd. without opinion 582 F.2d 1282 (7th Cir. 1978). We again uphold respondent's determinations. Grantors of ESP family trusts repeatedly have been unable to escape taxation because of the grantor trust provisions of sections 671 through 677. See, e.g., Vnuk v. Commissioner,supra;Vercio v. Commissioner,supra;Wesenberg v. Commissioner,supra;Antonelli v. Commissioner,T.C. Memo. 1980-544; Basham v. Commissioner,T.C. Memo. 1980-545. We reach the same conclusion here. Petitioners are taxable on the income of the trusts since they retained the power to control them. In fact, it would be unrealistic to assume that anyone would transfer his or her lifetime services to an ESP family trust without having such control. However, petitioners claim that in 1977 and 1978, Deborah, as a trustee and a holder of units of beneficial interest, was an adverse party for purposes of sections 671 through 678. We do not agree. *437 Whether the economic arrangements of a trust cause a trustee to be an adverse party is a factual question dependent on the merits of each case. Paxton v. Commissioner,520 F.2d 923 (9th Cir. 1975), affg. 57 T.C. 627 (1972). Petitioners have failed to prove that the interest of Deborah was a "substantial beneficial interest" and on this record we find to the contrary. Even if her interest could be characterized as substantial, the record does not indicate in any way that Deborah was an adverse party. Sections 672 and 674. See Wesenberg v. Commissioner,supra;Broncatti v. Commissioner,T.C. Memo. 1981-452; and Antonelli v. Commissioner,supra.Rather, there is nothing in the record to show by a preponderance of the evidence that this adult child of petitioners was anything but a related or subordinate party presumed to be subservient to the grantor under section 672(c) for purposes of sections 674 and 675. It is clear that petitioners were not adverse parties to each other. Vercio v. Commissioner,supra.Based on the application of the grantor trust provisions, *438 we sustain respondent's determinations. In light of our holdings, Darlene is not entitled to Individual Retirement Account deductions under section 219 on the "consulting fees" purportedly received from the Equity Trust. Respondent's determinations must be sustained on this issue. A feeble attempt was made at trial by Mark to show that he was entitled to business expenses in excess of those allowed by respondent for his accounting business. The burden is on petitioner to prove that respondent's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We also observe that this Court is not compelled, nor expected, to accept taxpayer's self-serving statements made to sustain his burden of proof. Geiger v. Commissioner,440 F.2d 688 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court. We found that Mark was not a credible witness. Only if we believed his testimony, which we do not, would we be justified in changing the results of respondent's determinations. Petitioners have failed to meet their burden of proof and we sustain respondent's determinations on this point. With respect to the addition *439 to tax under section 6653(a), petitioners have the burden of proving that their underpayments of tax were not due to negligence or intentional disregard of rules and regulations. Vnuk v. Commissioner,supra; see Crowley v. Commissioner,T.C. Memo. 1982-211. Not only have petitioners not met this burden, but we believe the record is clear that the petitioners were negligent and intentionally disregarded the rules and regulations. Mark claimed at trial that he set up the trusts for estate planning purposes for his family.We are not required to believe unsupported self-serving statements made by a petitioner without evaluating it in light of all the facts and circumstances in the record. Anderson v. Commissioner,55 T.C. 756, 758 (1971). Based upon this record, we are convinced that the primary, if not sole, purpose of the petitioners was to disregard the tax laws in their attempt to avoid application of the law to them. We agree with the statement in Harris v. Commissioner,T.C. Memo. 1981-46: "To anyone (and we would include petitioners) not incorrigibly addicted to the 'free lunch' philosophy of life, the *440 entire scheme had to have been seen as a wholly transparent sham." After only meeting with ESP representatives, who were an engineer, a salesman and an insurance man, and without consulting competent counsel, petitioners embarked upon their family trust scheme. They did so even though Mark had been practicing as an accountant since 1952 in a practice that involved the Federal income tax laws. Mark had to know the ESP package was a rotten apple insofar as the Federal income tax laws were concerned. He not only bought two, but peddled even more to his clients. Both petitioners disregarded the purported assignments of their lifetime services when they reported so-called commissions and consulting fees on their individual returns. Petitioners knew what they were doing and intentionally disregarded the tax laws. The five percent addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations in the family trust cases in situations similar to the one before us has been consistently upheld by this Court. Wesenberg v. Commissioner,supra.[7] Since Mark willingly promoted these ESP trusts, we find the five percent addition *441 to tax a modest penalty to impose on someone engaged in a "flagrant tax avoidance scheme." Wesenberg v. Commissioner,supra at 1015. We agree that the additions to tax should be imposed. Decisions will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year, unless otherwise indicated. All references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
2. Pursuant to the order of the Chief Judge, on the authority of the "otherwise provided" language of Rule 182, the post-trial procedures set forth in that rule are not applicable in this case.↩
3. The copy furnished by the parties to the Court as Exhibit 8-H lacks the page bearing the designation "PAGE 1303", which page apparently set forth the items on the page bearing the designation "PAGE 1192" of Exhibit 7-G.↩
4. We note that respondent's allowance exceeds the limitation of 15 percent of compensation set forth in section 219 by the de minimus amount of fifteen cents. (.15 X $ 1,477 (rounded off) = $ 221.55).↩
5. See Crowley v. Commissioner,T.C. Memo. 1982-211; Antonelli v. Commissioner,T.C. Memo. 1980-544; Basham v. Commissioner,T.C. Memo. 1980-545 and Corcoran v. Commissioner,T.C. Memo. 1980-546↩. 6. See, e.g., Antonelli v. Commissioner,supra;Basham v. Commissioner,supra,Corcoran v. Commissioner,supra and Dombrowski v. Commissioner,T.C. Memo. 1980-261↩. We are aware of over fifty decisions of this Court and the Courts of Appeals which have reached this result.
7. See Broncatti v. Commissioner,supra;Corcoran v. Commissioner,supra;Basham v. Commissioner,supra and Antonelli v. Commissioner,supra.↩